GEORGE S. CARDONA
Acting United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
IRA A. DAVES
Assistant United States Attorney
California Bar No. 156724
    Room 7516, Federal Building
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone:  (213) 894-2443
    Fax: (213) 894-7819
    E-Mail: Ira.Daves@usdoj.gov

Attorneys for Defendant John E. Potter, Postmaster General

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| CAROL BROWN, | ) | No. CV 08-3095-R(MANx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Date: November 30, 2009 |
| | ) | |
| JOHN E. POTTER, | ) | Time: 10:00 a.m. |
| POSTMASTER GENERAL, | ) | |
| | ) | |
| Defendant. | ) | Hon. Manuel L. Real |
| _____ | ) | United States District Judge |

SEPARATE STATEMENT OF UNCONTROVERTED FACTS

AND CONCLUSIONS OF LAW RE:

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT[1]

_____

    [1] Defendant submits this Revised Separate Statement, in compliance with the Court's November 30, 2009 Order at the hearing on Defendant's Motion.

1   After consideration of the papers in support of and in

2   opposition to Defendant's Motion for Summary Judgment or, in the

3   Alternative, Partial Summary Judgment, the Court determines that

4   the following facts have been established as,

5

6                          UNCONTROVERTED FACTS

7   1.   Plaintiff Carol Brown ("Brown") filed this action for

8        alleged employment discrimination under the Rehabilitation

9        Act of 1973 and Title VII of the Civil Rights Act of 1964,

10       as amended, based on (1) multiple injuries she sustained

11       while employed as a clerical worker for the Postal Service,

12       (2) her race (African-American), and (3) her gender.

13  2.   Defendant John E. Potter, Postmaster General ("Defendant"),

14       now moves for summary judgment or, in the alternative,

15       partial summary judgment.  The Court grants Defendant's

16       motion in its entirety.

17  3.   Brown was hired by the USPS as a Mark-Up Clerk on March 1,

18       1986.  (SAC ¶¶ 1, 48; Solis Dec. ¶ 2)

19  4.   She was assigned to the Marina Del Rey Mail Processing

20       Center ("Marina station"), where she remained for the next

21       nineteen years.  (SAC ¶¶ 1, 48; Solis Dec. ¶ 2)

22  5.   While at the Marina Station, Brown felt that she was

23       harassed by two of the managers at the Marina Station.

24  6.   At some point in 1989, Brown injured her lower back while at

25       work.  (SAC ¶ 48; Solis Dec. ¶ 2)

26  7.   Two years later, on October 31, 1992, Brown sustained

27

28                                 2

another injury at work.  (Solis Dec. ¶ 2)

8.  This time, she re-injured her lower back and she also
    injured her right knee.  (SAC ¶ 48; Solis Dec. ¶ 2)

9.  Brown filed a workers' compensation claim in connection with
    the second set of injuries.  (Solis Dec. ¶ 2)

10. On or about November 4, 1992, the U.S. Department of Labor
    ("DOL") accepted her workers' compensation claim.  (Id.)

11. Beginning in or about 1993, Brown received reasonable
    accommodations for her injuries while at the Marina Station.
    (SAC ¶ 49; Solis Dec. ¶ 3)

12. Specifically, she was placed on limited duty and was
    provided a lower lumbar support chair.  (Id.)

13. In or about 1996, Brown was diagnosed with diabetes and high
    blood pressure.  (SAC ¶ 48; Solis Dec. ¶ 4)

14. In or about 1999 or 2000, Brown developed bilateral carpal
    tunnel syndrome.  (Id.)

15. Despite her multiple injuries and other medical issues,
    Brown continued to perform her clerical duties, with
    accommodation, until the closure of the Marina Station in
    the first week of July 2005.  (SAC ¶ 49; Solis Dec. ¶ 5)

16. Because the Marina Station was closing, Brown and the other
    employees who worked at that facility faced job eliminations
    or transfers to other Postal facilities.  (Solis Dec. ¶ 5)

17. Brown was transferred to the Bellflower Post Office, a
    location she herself selected.  (SAC ¶ 1; Solis Dec. ¶ 5)

18. Brown selected that particular location, in order to reduce

1       the stress of the commute.  (Id.)

2   19. On or about June 24, 2005, before the Marina Station closed

3       and while she was facing transfer to Bellflower, Brown

4       secured a medical evaluation with orthopedic physician Dr.

5       Jeffrey Colbert.  (Solis Dec. ¶ 6)

6   20. Dr. Colbert diagnosed Brown with chronic lumbar strain,

7       right knee strain, and obesity.  (Id.)

8   21. Brown's clerical duties at her new position in Bellflower

9       required frequent, continuous use of her back, hands, and

10      legs.  (Solis Dec. ¶ 7)

11  22. A window clerk position generally required the employee to

12      sit or stand at a customer service window for eight hours a

13      day.  (Id.)

14  23. Postal clerks typically worked long shifts performing

15      customer service functions; other clerks were required to

16      spend hours handling large volumes of mail, from business-

17      sized envelopes to large packages.  (Id.)

18  24. Brown's medical issues, however, required limitations on

19      what she could and could not do.  (Id.)

20  25. Dr. Colbert provided Brown with multiple substantial work

21      restrictions, including:  continuous sitting up to one hour,

22      continuous standing up to one hour, continuous walking up to

23      fifteen minutes, no climbing or kneeling, and continuous

24      bending/stooping up to thirty minutes.  (Id.)

25  26. Dr. Colbert also wrote Brown a prescription for a chair with

26      lumbar support and no wheels.  (Id.)

27

28                                      4

27. Brown started her new position at the Bellflower Post Office on July 8 or 9, 2005.  (SAC ¶ 55; Kuang Dec. ¶ 2)

28. She was assigned to work as a Sales, Services (Window)/Distribution Clerk.  (Kuang Dec. ¶ 2)

29. When Brown reported for duty, she provided management her medical restrictions.  (<u>Id.</u>)

30. Brown claims that, prior to her arrival, the Postmaster at Bellflower expressed reservations about having Brown on staff, given her multiple physical conditions.  Despite his reservations, however, the transfer took place.  (Solis Dec. ¶ 9)

31. Brown began her new assignment without incident.  (Kuang Dec. ¶ 3)

32. Within the first few weeks, however, Brown voiced complaints about working outside her medical restrictions.  (SAC ¶¶ 56, 57; Solis Dec. ¶ 3)

33. She requested, among other accommodations, that management: (1) provide her a chair with lower lumbar support; (2) limit her work to activities within her physical restrictions; and (3) allow her to alternate between sitting one hour and standing one hour at a time.  (SAC ¶ 58; Kuang Dec. ¶ 3)

34. Management permitted Brown to use her supervisor's chair to use while doing her desk work.  (Kuang Dec. ¶ 4)

35. In addition, management purchased a special chair from a catalog called Lab Safety specifically so that Brown could work the retail counter comfortably.  (<u>Id.</u>)

36. The chair that was purchased for Brown to use at the window was adjustable in height, offered back support, and came with a foot rest that swivelled, though there is some question as to whether the back qualified as official "lumbar support." (<u>Id.</u>)

37. In addition to the two chairs that Brown was provided, management allowed Brown to alternate one hour of desk work and one hour of window work. (Kuang Dec. ¶ 5)  When working the window, Brown was allowed to sit and assist customers of her choosing; she was told that she need only perform those transactions that would not exceed her work restrictions. (<u>Id.</u>)

38. Brown asked that her second day off be changed so that she would have two consecutive days off, rather than one day off at a time. (<u>Id.</u>)

39. At first, Brown said that the two consecutive days off could either be Saturday and Sunday or Sunday and Monday. (<u>Id.</u>)

40. Management told Brown that they could not give her Mondays off because of the high volume of window customers on that day. (<u>Id.</u>)

41. Brown complained that the chair she had been given to use at the window was inadequate. (SAC ¶ 11; Kuang Dec. ¶ 7)

42. She said that she wanted a chair similar to the one she had used at the Marina station. (Kuang Dec. ¶ 2)

43. Further, Brown demanded to have input on what chair would be purchased for her. (Kuang Dec. ¶ 7)

44.  Management requested information from Brown, such as the
     store from which the Marina chair had been purchased and the
     serial number of the chair.  (<u>Id.</u>)

45.  On or about October 19, 2005, Brown renewed her complaints
     about being worked outside her medical restrictions.  (Solis
     Dec. ¶ 15)

46.  Supervisor Kuang did not understand why Brown was still
     complaining, because he had scheduled her to alternate
     between performing window work and desk work, one hour at a
     time.  (<u>Id.</u>)

47.  Management agreed to allow Brown to process second notices
     for certified mail that customers needed to pick up, as well
     as certificates of delivery.  (Solis Dec. ¶ 16; Kuang Dec. ¶
     10)

48.  The remainder of the workday would be filled by work as
     needed.  (Solis Dec. ¶ 16; Kuang Dec. ¶ 11)

49.  Typically, Brown would be assigned to sell money orders and
     stamps.  (Kuang Dec. ¶ 13)

50.  Several months into the start of her employment at
     Bellflower, Brown provided Kuang information about the chair
     she wanted purchased for her.  Specifically, she gave Kuang
     the name of a furniture store.  Kuang determined that the
     store was no longer doing business at the location Brown
     gave him.  (<u>Id.</u>)

51.  Kuang endeavored to find Brown a chair to serve as a
     suitable replacement for the chair that had already been

1    purchased for her.  (Id.)

2  52.  In the meantime, Brown objected to writing and throwing

3    certified letters and flats.  (SAC ¶ 62; Solis Dec. ¶ 19)

4  53.  She also objected to selling money orders and stamps.  (Id.)

5  54.  She felt that those duties exceeded her work restrictions in

6    that they required her to work the window for two-hour

7    stretches and type repetitively without proper back support,

8    even though the chair that had been purchased for her

9    contained back support.  (Id.)

10  55.  She returned to her physician for further assistance.  (SAC

11    ¶¶ 9, 11; Solis Dec. ¶ 19)

12  56.  In or about February 2006, Brown gave management a written

13    medical restriction in which her physician advised that

14    Brown needed to have two consecutive days off.  (SAC ¶¶ 9,

15    11; Kuang Dec. ¶ 14)

16  57.  Her physician claimed that Brown's health was failing under

17    the current arrangements and that she needed an extended

18    period of recovery time before commencing a new work week.

19    (Id.)

20  58.  When management failed immediately to act upon this

21    particular demand, Brown commenced an extended leave of

22    absence, which lasted from March 18, 2006 to May 8, 2006.

23    (SAC ¶ 9; Kuang Dec. ¶ 14)

24  59.  When Brown returned to work on or about May 19, 2006, she

25    presented to management another note from her doctor.  (SAC

26    ¶ 9)

27

28                                      8

60.  As before, her doctor asked that Brown be given two consecutive days of rest.  (Id.)

61.  Management granted Brown's request for two consecutive days off.  (SAC ¶¶ 9, 11; Kuang Dec. ¶ 15)

62.  Management notified Brown that effective June 3, 2006, her two consecutive days off would be Saturday and Sunday.  (SAC ¶ 9; Kuang Dec. ¶ 15)

63.  Even though management accommodated her request for consecutive days off, Brown remained displeased.  (SAC ¶ 9, 11; Kuang Dec. ¶ 18)

64.  Brown claimed that she needed her consecutive days off to be Sunday and Monday instead of Saturday and Sunday, so she could use Mondays to schedule medical appointments, as she had done in the past.  (SAC ¶ 9, 11; Kuang Dec. ¶ 16)

65.  She requested a meeting with management.  (Id.)

66.  The meeting took place on or about June 7, 2006.  (SAC ¶¶ 9, 64; Kuang Dec. ¶ 17)

67.  Brown asked to be given her preferred schedule.  (Id.)

68.  Management wished to stick to their decision and attempted to explain why.  (SAC ¶ 9; Kuang Dec. ¶ 17)

69.  Management advised Brown that Monday is normally the busiest day for the retail window, and that on Saturday the Post Office was only open for half a day.  (Kuang Dec. ¶ 17)

70.  Management further advised Brown that it had no problem with approving time off for her medical appointments on Mondays.  (SAC ¶ 9; Kuang Dec. ¶ 17)

9

71. Brown was upset that management declined to her request for Mondays off. (Kuang Dec. ¶ 18)

72. The meeting left Brown with an additional concern. During their meeting, Brown learned information from which she concluded that management had maintained a file of her medical records, which she felt violated a workplace policy. (SAC ¶ 64)

73. On June 19, 2006, Brown contacted an EEO counselor in order to pursue an EEO complaint against management for alleged disability discrimination. (SAC ¶¶ 1, 8)

74. Although the triggering event was the meeting of June 7, 2006, Brown complained of events dating back to July 8, 2005, at about the time of her initial transfer to Bellflower. (SAC ¶¶ 8, 11)

75. Brown also complained to the EEO counselor that management was keeping a file containing her medical records. (SAC ¶ 12)

76. On June 21, 2006, after learning of Brown's EEO complaint, Supervisor Kuang gave Brown catalogs of chairs and asked that she select a chair that met her particular needs. (SAC ¶ 11; Kuang Dec. ¶ 19)

77. Brown objected that the catalogs were too heavy for her to use. (SAC ¶ 66; Kuang Dec. ¶ 19)

78. The following week, Kuang asked Brown if her doctor had recommended a chair yet. (Kuang Dec. ¶ 20)

79. Brown responded that he had not. (Id.)

80. She then commenced a second extended leave of absence. (SAC ¶ 11; Kuang Dec. ¶ 21)

81. This time, her leave lasted approximately six months, from July 5, 2006 to January 22, 2007. (Id.)

82. On August 17, 2006, approximately five weeks after she commenced this second extended leave, Brown was examined by Dr. William Simpson. (Solis Dec. ¶ 30)

83. Dr. Simpson diagnosed Brown with having bilateral carpal tunnel syndrome and impingement syndrome bilateral shoulders. (Id.)

84. On August 25, 2006, Brown filed a formal EEO complaint, alleging disability and race discrimination, as well as retaliation and harassment. (SAC ¶ 11; Solis Dec. ¶ 31) Brown's basic complaint was that the Postal Service failed, in numerous respects, to abide by her medical restrictions. (SAC ¶ 11; Solis Dec. ¶ 31) She also complained that being required to look through heavy catalogs for chairs aggravated her carpal tunnel syndrome. (SAC ¶ 12; Solis Dec. ¶ 31)

85. When Brown returned to work at Bellflower in January 2007, she brought with her a multitude of additional work restrictions based on Dr. Simpson's diagnoses, including: intermittent lifting up to ten pounds; continuous sitting up to fours hours and intermittent sitting up to eight hours; intermittent standing up to one hour; intermittent walking up to four hours; no climbing, kneeling, bending, stooping,

twisting, pulling or pushing; intermittent simple grasping up to eight hours; intermittent fine manipulation up to one hour; no reaching above the shoulder; intermittent driving up to two hours; and no operating machinery. (Kuang Dec. ¶ 22)

86. In light of her myriad new restrictions, management met with Brown and the Vice President of her union to ascertain precisely what job functions she was able at that time to perform. (SAC ¶ 69; Kuang Dec. ¶ 23)

87. During the meeting, the Postmaster expressed the view that, given the collective magnitude of restrictions, there was nothing for Brown to do in his office. (SAC ¶ 67; Kuang Dec. ¶ 23)

88. Following the meeting, Brown was taken off the window and given desk work only. (Kuang Dec. ¶ 24)

89. On January 22 or 23, 2007, management provide Brown a third chair. (SAC ¶ 68; Kuang Dec. ¶ 24)

90. Brown found this chair to be acceptable. (SAC ¶ 68; Kuang Dec. ¶ 24)

91. She was also given a back brace. (Id.)

92. Seeking to comply with Brown's new restrictions, Supervisor Kuang had the chair's wheels replaced with bell glides the following day. (Kuang Dec. ¶ 24)

93. On January 26, 2007, Brown provided management with a prescription for a chair with lumbar support **and** wheels. (Kuang Dec. ¶ 25)

12

94. In addition to provide the new prescription, Brown informed management that she could not do various specific tasks. (Id.)

95. As such, the list of available work for Brown to perform at the Bellflower Post Office was severely curtailed, to the point where she was only called upon to process second notices for certified mail that customers needed to pick up. (Id.)

96. The Bellflower Post Office did not have eight hours of such work a day, and a funded position did not exist in the USPS to perform just this task. (Id.)

97. When Brown was informed that there was no longer any meaningful work for her at Bellflower, she became temporarily disabled. (Kuang Dec. ¶ 26)

98. Her temporary disability lasted for a two-month period, from March 8, 2007 to May 1, 2007. (Id.)

99. On March 19, 2007, while Brown was off-work on temporary disability, Candy Palencia, Supervisor, Customer Service, nominated Brown for reasonable accommodation consideration by the Postal Service's District Reasonable Accommodation Committee ("DRAC"). (Solis Dec. ¶ 37)

100. The purpose of nominating her was to determine if there was productive work that Brown could have been offered. (Id.)

101. Brown declined to participate, however, in the DRAC process. (Id.)

102. Management then conducted a search to find suitable work for

her within a fifty-mile radius.  (<u>Id.</u>)

103. Work was located at the Postal facility in Santa Ana.  (<u>Id.</u>)
Brown was then slated for transfer to the Santa Ana
facility, where she would be assigned to work a voice
recognition machine in the CFS Unit.  (<u>Id.</u>)

104. On June 12, 2007, after she returned to work and discovered
that she had been reassigned to Santa Ana, Brown made a
second contact with an EEO counselor in order to alleged
further acts of discrimination and retaliation.  (SAC ¶¶ 1,
18, 19; Solis Dec. ¶ 38)

105. Brown objected to being reassigned to Santa Ana.  (SAC ¶ 1)

106. She complained about the increased commute and the change in
her hours to an early morning shift.  (SAC ¶¶ 1, 21)

107. She also complained that there were positions available at
the Bellflower facility that she could perform with
reasonable accommodations.  (SAC ¶ 1)

108. On August 16, 2007, Brown filed a second formal EEO
complaint, in which she alleged not only disability
discrimination, but also gender discrimination, race
discrimination, and retaliation for her prior EEO activity.
(SAC ¶ 21)

109. In her second EEO complaint, Brown claimed that the transfer
to Santa Ana amounted to a denial of reasonable
accommodations.  (SAC ¶ 22)

110. Brown admitted that other disabled employees had been
reasonably accommodated at Bellflower.  (SAC ¶ 21)

14

111. She claimed, however, that the employees who received accommodations were not African-American.  (Id.)

112. On January 16, 2008, while at Santa Ana, Brown initiated EEO contact that led to the filing of a third EEO complaint, in connection with being denied a change of work schedule on December 24 and 31, 2007.  (SAC ¶¶ 2, 25, 28; Fuentes Dec. ¶ 2)

113. Brown objected to having to work her normal shift on Christmas Eve and New Year's Eve.  (SAC ¶ 28; Fuentes Dec. ¶ 2)

114. She claimed that everyone but her was given the option of changing the shift on those days or taking those days off.  (Id.)

115. On February 7 and 27, 2008, the Postal Service issued final agency decisions respectively dismissing Brown's first two EEO complaints.  (SAC ¶ 17)

116. On or about March 27, 2008, approximately nine months after starting her new position in Santa Ana, Brown learned that her work schedule would again change.  (Hoang Dec. ¶ 2)

117. Instead of from 6:00 p.m. to 2:30 p.m., her new shift would run from 2:00 p.m. to 10:30 p.m.; and instead of having the consecutive days of Saturday and Sunday off, she would have the non-consecutive days of Sunday and Tuesday off.  (SAC ¶¶ 32, 70; Hoang Dec. ¶ 2)

118. Brown objected to the change in work schedule.  (SAC ¶ 32)

119. Two weeks before Brown learned of the change, management had

advised staff that whatever schedules they had been given before being assigned to the CFS Unit would be honored. (SAC ¶¶ 32, 72; Hoang Dec. ¶ 3)

120. Brown concluded, therefore, that the change of her work schedule violated management's prior representations. (SAC ¶ 32; Hoang Dec. ¶ 3)

121. On April 11, 2008, Brown provided management a copy of her work restrictions requiring consecutive days off. (SAC ¶¶ 32, 74; Hoang Dec. ¶ 4)

122. Management advised Brown that the work restrictions would have to be forwarded to the Office of Injury Compensation for approval, which it was. (SAC ¶¶ 32, 74; Hoang Dec. ¶ 4)

123. Although Brown only worked one or two shifts under the changed schedule, Brown felt that Santa Ana management should have forwarded her work restrictions to the Office of Injury Compensation before changing her work schedule. (SAC ¶ 32; Hoang Dec. ¶ 4)

124. She further believed that the failure to forward the paperwork prior to implementing the change amounted to retaliation. (SAC ¶ 32)

125. On April 14, 2008, Brown sought another round of EEO counseling, which led to her filing a fourth EEO complaint, this time in connection with an alleged failure to observe her physician's requirement that she been given two consecutive days off. (SAC ¶¶ 2, 32)

126. On May 12, 2008, Brown filed this action.

127. Brown's re-assignment to Santa Ana came to an end, and she was transferred back to Bellflower. (Hoang Dec. ¶ 5)

128. Brown's last day in Santa Ana was Friday, May 23, 2008. (Id.)

129. On May 30, 2008, Brown signed her acceptance a limited duty job offer as a Window/Distribution Associate at the Bellflower Post Office. (Kuang Dec. ¶ 27)

130. Her work hours were from 8:00 a.m. to 5:00 p.m., with Saturday and Sunday off. (SAC ¶ 39; Kuang Dec. ¶ 27)

131. On May 28, 2008, Brown reported for work in Bellflower. (Kuang Dec. ¶ 27)

132. Management assigned some of her duties to other employees. (SAC ¶ 39; Kuang Dec. ¶ 27)

133. Specifically, on July 17, 2008 through July 29, 2008, Brown received work instructions from a carrier supervisor rather than from her direct supervisor (Kuang), and other employees did work that Brown was tasked with performing, including: working the window, working UBBM and POS express mail, and throwing letters in the P.O. Box section. (SAC ¶¶ 39, 86, 88; Kuang Dec. ¶ 28)

134. For example, on July 21, 2008, Brown threw mail for an hour in the P.O. Box section, after which time she was instructed by a temporary carrier supervisor to throw mail in that section only when another employee was not present to do it. (SAC ¶¶ 39, 89; Kuang Dec. ¶ 28)  On July 24, 2008, Brown worked the P.O. Box section when another employee failed to

17

report to work.  (SAC ¶ 90; Kuang Dec. ¶ 28)  However, on September 15, 2008, Brown did not work the P.O. Box section, even though other employees were unavailable.  (SAC ¶ 91; Kuang Dec. ¶ 28)

135. Brown claims that, during this time period, she sat in a room by herself with no work to perform, while other employees -- including part-time flexibles -- performed Brown's duties.  (SAC ¶¶ 39, 87, 93; Kuang Dec. ¶ 29)

136. She further claims that she was the only employee at the Bellflower office who was given no work to perform.  (SAC ¶ 39; Kuang Dec. ¶ 29)

137. She says that she felt "isolated and segregated."  (SAC ¶ 39)

138. During this time period, she claims, she clocked in as "non-productive."  (SAC ¶ 39)

139. On August 14, 2008, Brown made initial contact with an EEO counselor regarding issues that eventually formed the basis for a fifth formal EEO complaint, which she filed on October 23, 2008.  (SAC ¶¶ 38, 40)

140. She believed that unilaterally changing her shift from August 11 to August 14, 2008 violated her medical restrictions.  (SAC ¶ 75)

141. The Postal Service issued final agency decisions on Brown's third and fourth EEO complaints, which Brown received on August 28, 2008.  (SAC ¶ 37)

142. On September 17, 2008, Brown was given yet another job

offer.  (SAC ¶ 94; Kuang Dec. ¶ 31)

143. The offer excluded window and POS duties, limited her bulk
     mail or "UBBM" duties, and increased her "stand-by" time
     from 1 to 8 hours.  (<u>Id.</u>)

144. Brown objected to the offer.  (SAC ¶ 94)

145. On September 25, 2008, Brown contacted EEO for yet
     additional counseling.  (SAC ¶ 41)

146. She alleged that the agency denied her the opportunity to
     perform her duties, despite the availability of work, after
     she returned to Bellflower.  (SAC ¶ 42)

147. She claimed that she was excluded from window and POS duties
     and was given limited UBBM duties.  (<u>Id.</u>)

148. She further claimed that her "stand-by" time was increased
     from 1 to 8 hours.  (<u>Id.</u>)

149. She further claimed that she was forced to clock in as non-
     productive.  (<u>Id.</u>)

150. Finally, she claimed that she was being set-up for a
     determination that the Postal Service had no work available
     for her to perform -- a precursor to termination.  (<u>Id.</u>)

151. On January 22, 2009, Brown filed a Second Amended Complaint
     ("SAC") in this action.

152. The SAC incorporated the newly dismissed fifth and sixth
     complaints.  The fifth and sixth EEO contacts were
     consolidated into one complaint, which the agency dismissed
     on December 4, 2008.  (SAC ¶¶ 43, 45)

153. In summary, the Court finds that, while Brown was employed

at the Marina Office, the Postal managers gave her an
ergonomic chair; when she transferred to Bellflower, they
purchased two more chairs for her use (both of those chairs
had back support), and they allowed her to use her
supervisor's chair when doing desk work; they further abided
by her physician's restrictions by modifying her assignments
so that she would have diminished duties that would not
require unduly repetitive hand and arm motion; once she
provided appropriate medical documentation, they gave her
consecutive days off; when all those efforts did not meet
her needs, they transferred her to Santa Ana so that she
could perform her duties by means of a voice activated
computer; and, finally, when the Santa Ana position came to
an end, they offered her desk work only, which she refused.
They took her off the active rolls only after all else
failed.

154. Brown remains a Postal employee and presently collecting
untaxed OWCP benefits.

Based on the foregoing Uncontroverted Facts, the Court now
makes its,

## CONCLUSIONS OF LAW

1. The Rehabilitation Act of 1973 requires federal agencies,
including the USPS, to provide reasonable accommodation to
the known physical or mental limitations of an otherwise
qualified applicant or employee with a disability, unless to

do so would cause the employer undue hardship.  29 C.F.R. §
1630.9.  Section 504 of the Rehabilitation Act provides that
"no otherwise qualified individual with a disability . . .
shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits
of, or be subjected to discrimination under any program of
activity receiving federal financial assistance."  29 U.S.C.
§ 794(a).

2.   Title II of the Americans with Disabilities Act ("ADA")
provides identical protection against disability
discrimination in employment.  *See* 42 U.S.C. § 12132.  The
ADA requires its provisions to be interpreted in a way that
"prevents imposition of inconsistent or conflicting
standards for the same requirements" under the
Rehabilitation Act.  *See* 42 U.S.C.A § 12117(b) (West Supp.
2000); Wong v. Regents of University of California, 410 F.3d
1052, 1055 n.1 (9th Cir. 2005).

3.   The term "disability" is defined as "(A) a physical or
mental impairment that substantially limits one or more of
the major life activities of [the] individual; (B) a record
of such an impairment; or (C) being regarded as having such
an impairment."  42 U.S.C. § 12102(2).  Under the applicable
federal regulations, major life activities include functions
"such as caring for oneself, performing manual tasks,
walking, seeing, hearing, speaking, breathing, learning, and
working."  29 C.F.R. § 1630.2(I); 29 C.F.R. § 1630.2(I).

21

4.  On September 25, 2008, Congress passed the ADA Amendments Act of 2008, which rejected the Supreme Court's interpretation of the term "disability" in <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and <u>Toyota Motor Manufacturing Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).  The amendments expanded the class of individuals who are entitled to protection under the ADA.

5.  The Court finds that there is a triable issue of fact regarding whether any or all of Brown's physical conditions actually substantially limited a major life activity.  The issue, therefore, becomes whether Brown was otherwise qualified for her position.

6.  An otherwise qualified individual with a disability is one who (a) has an impairment which substantially limits one or more major life activities; (b) has a record of such impairment; or (c) is regarded as having such an impairment, and can perform the essential functions of her position, with or without a reasonable accommodation.  29 C.F.R. § 1630.2(m).

7.  Essential functions are "fundamental job duties of the employment position . . . not including the marginal functions of the position."  <u>Bates v. United Parcel Services, Inc.</u>, 511 F.3d 974, 988 (9th Cir. 2007) (quoting 29 C.F.R. § 1630.2(n)(1)).  In assessing a position's essential functions, "consideration shall be given to the

22

employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

8. The Court finds that, as a matter of law, Brown's physical restrictions disqualified her for the clerical position she held.

9. Brown's window clerk position required frequent and continuous use of her back, hands, and legs. Her position generally required her to work at a customer service window for eight hours a day. Although Brown disputes that she had to stand at the window, she does not dispute that the customer service position typically required the handling of large volumes of mail, some of which involved lifting large packages.

10. Moreover, it was contingent upon Brown to identify a reasonable accommodation that would have enabled her to perform those essential functions. *See* Zukle v. Regents of Univ. Of Calif., 166 F.3d 1041, 1046 (9th Cir. 1999); Haysman v. Food Lion, Inc., 893 F.Supp. 1092, 1102 (S.D.Ga. 1995). Brown offered no evidence in this regard and, consequently, has failed to meet her burden.

11. Indeed, the undisputed evidence presented to this Court shows that, even when Brown was given limited-duty positions, she could not meet the essential requirements without risking further injury, and this was true even after she received numerous additional accommodations. The Postal Service had no obligation under the Rehab Act to create an

1    entirely new job for her. *See* Wellington v. Lyon County

2    School District, 187 F.3d 1150, 1155-56 (9th Cir. 1999).

3    Nor did the Postal Service have a duty to continue creating

4    limited-duty positions, particularly after its initial

5    endeavors to keep Brown safely and productively employed

6    proved unsuccessful. *See* Taylor v. Garrett, 820 F.Supp.

7    933, 938 n.9 (E.D. Pa. 1993).

8  12.   FECA requires employers to allow injured employees to return

9    to their old positions or, if they can no longer perform

10    their original duties, to offer them reasonable alternative

11    positions. 5 U.S.C. § 8151(b); 20 C.F.R. § 10.505; *see also*

12    Meester v. Runyon, 149 F.3d 855, 856 (9th Cir. 1998), *cert.*

13    *denied*, 526 U.S. 1144 (1999). Brown does not assert a

14    violation under FECA, nor could she sustain such a claim,

15    since limited-duty positions were created for her.

16  13.   The Court further finds that Brown was reasonably

17    accommodated following a series of good-faith meetings and

18    other interactions, even though she was not a qualified

19    employee entitled to reasonable accommodations.

20  14.   It is an unlawful employment practice for an employer to

21    fail to engage in a timely, good faith, interactive process

22    with an employee to determine reasonable accommodations for

23    known disabilities. *See* Barnett v. U.S. Air, Inc., 228 F.3d

24    1105, 1114 (9th Cir. 2000), *cert. granted in part on other*

25    *grounds*, 532 U.S. 970 (2001). Reasonable accommodations are

26    mechanisms to remove barriers or provide assistance to

27

28                                   24

disabled individuals so that they can perform the essential functions of their jobs.  <u>Cripe v. City of San Jose</u>, 261 F.3d 877, 889 (9th Cir. 2001).  However, employers are not required to waive or reallocate essential functions.  29 C.F.R. Pt. 1630 App. § 16340.2(o).

15.  Brown has presented no evidence from which a trier of fact reasonably could conclude that the Postal managers failed to engage in the interactive process with her or, after engaging in the interaction process, failed to give her reasonable accommodations.  Brown's declaration merely sets forth a series of unsupported statements characterizing her managers as unkind.  She states, for example:  "[i]nstead of talking with me about my physical condition and what accommodations I needed, management just pushed me out to training and, when I returned, had me perform all the duties of a Window Clerk with no accommodation."  (Brown Dec. ¶ 19)  Statements such as these are inadmissible under Fed.R.Evid. 602, 611(a), 103(c), 404-405, and 701.

16.  Even if such statements were admissible, they would fall short of raising a triable issue.  After Brown initial workers' compensation claim was accepted by DOL, the Postal Service placed her on limited duty and gave her a chair with back support.  When she transferred to her window clerk position in Bellflower in July 2005, the Postal managers did not "sit back passively" and "offer nothing."  <u>Taylor v. Phoenixville School District</u>, 184 F.3d 296, 312 (3d Cir.

25

1999).   They were proactive and gave Brown a supervisor's
chair to use while performing desk work.  (Brown Depo. 54:1-
55:9)  They then purchased for her use at the window an
adjustable chair with back support and foot rest.  (Brown
Depo. 54:21-25, 206:21-207:10 & Exh. 602)

17.  Brown disputes that she was given a supervisor's chair to
use while doing desk work and also that a chair was
purchased for and given to her.  (*See* Brown Dec. ¶ 18)  At
her deposition, however, Brown conceded that she took her
supervisor's chair and he never insisted that she give it
back.  (Brown Depo. 54:1-55:9)  She also testified that a
chair, which she referred to as a "stool" was purchased for
her.  (Brown Depo. 54:21-25, 206:21-207:10 & Exh. 602)  She
even identified the chair in a photograph, which clearly
showed that offered back support.  (Brown Depo. 206:21-
207:10 & Exh. 602)  Under the Ninth Circuit's "sham"
affidavit rule, "a party cannot create an issue of fact by
an affidavit contradicting his [or her] prior deposition
testimony."  <u>Kennedy v. Allied Mut. Inc. Co.</u>, 952 F.2d 262,
266 (9th Cir. 1991).

18.  The provision of accommodations continued.  When Brown
complained that the window chair was inadequate, the Postal
managers did not ignore her.  They requested information,
more than once, so that they could investigate a new
purchase for her.  When the Postal managers did not receive
the information requested, they took steps on their own to

find a suitable chair, sought specific input from Brown on June 21, 2006, purchased the chair, and then presented it to her (along with a back brace) in January 2007 after she returned from her second extended leave of absence.

19. Although the Postal managers at first resisted giving Brown two consecutive days off, it is undisputed that her initial request was not accompanied by a physician's certification that she needed that accommodation for health reasons. When she presented a physician's medical restriction in or about February 2006 supporting her request for consecutive days off, the Postal managers took the matter under advisement and, when Brown returned to work on May 19, 2006, they granted her request, effectively June 3, 2006.

20. Brown's insistence upon determining the particular days she would be given had no objective medical basis and, therefore, is irrelevant to the questions of whether the accommodation offered was reasonable or not.

21. The undisputed facts show that, from the beginning of her tenure at Bellflower, the Postal managers allowed Brown to sit or stand for one-hour stretches, according to her needs. She was permitted to assist customers of her choosing and was told not to perform transactions that exceeded her limitations. She has presented no evidence whatsoever supporting her claim that she was forced to stand or sit any longer than she was able. If she chose to sit or stand for longer periods than comfortable or perform duties that

1    unduly taxed her physical conditions, the Postal managers

2    could not have been reasonably expected to intervene each

3    time in order to prevent her from doing so.

4   22.   Indeed, the undisputed facts show that, throughout her

5    employment, the Postal managers did what they could to

6    accommodate Brown by changing and decreasing the work they

7    expected her to perform. For example, they assigned her to

8    process second notices for certified mail, as well as

9    certificates of delivery. These assignments did not require

10    the same level of continuous, customer-service interactions

11    that the window position required. The Postal managers also

12    relieved Brown of performing any work, except as needed to

13    sell money orders and stamps, in order to ensure that she

14    was not being overtaxed.

15   23.   Brown's response to these good-faith efforts was to lodge

16    additional complaints, claiming, for example, that she was

17    being required to remain at the window for longer than an

18    hour. Dr. Colbert had not restricted Brown, however, from

19    doing any work altogether for periods that exceeded one

20    hour; he merely restricted Brown from standing or sitting

21    for stretches exceeding one hour without breaks. There is

22    no evidence that any Postal manager ever insisted that Brown

23    chose between either to sitting or standing, without break,

24    while she sold the money orders or stamps.

25   24.   In any event, Brown's window job was essentially a desk job

26    that did not require any appreciable walking, climbing,

27

28                 28

kneeling, or driving; nor did her position require that she
bend or stoop continuously.  Consequently, Brown could not
have been called upon to perform any of these activities,
which she claimed would have placed a strain on her.[2]  Dr.
Simpson's August 2006 restrictions placed strict limitations
on what duties Brown could perform with her hands.  But,
this fact is equally unavailing to Brown; because the
undisputed evidence shows that the Postal managers
endeavored, after meeting with Brown and her union
representatives, to honor those restrictions by giving her
desk work only.

25.  When it appeared that the Bellflower Post Office did not
have enough work to keep Brown productively employed, given
her medical restrictions, the Postal managers did not
immediately terminate her.  They nominated her for
consideration by the District Reasonable Accommodation
Committee ("DRAC"), the purpose of which was to find her
suitable work.  It is undisputed that Brown declined to
participate.  Still, the Postal managers did not terminate
her.  Instead, they found her a position in Santa Ana, where
she would be assigned to work a voice recognition machine,
relieving her of all duties requiring use of her hands.[3]

---

[2]  Similarly, Dr. Colbert's initial prescription did not
preclude any lifting restrictions, nor did it restrict Brown's
hand usage.  Any job functions that involved lifting, typing or
writing, therefore, could not have been unreasonable at the time.

[3]  Postmaster Puskas's January 26, 2007 letter to
Contractor-Nurse Case Manager Nancy Lemus, which Brown attaches

Even this assignment, which placed no physical burdens on
her whatsoever, Brown managed to find unacceptable because
of the commute.  (Brown Dec. ¶ 29)

26.   Returning to Bellflower, Brown made yet additional
complaints, this time based on the Postal managers' alleged
failure to give her work that she claimed she could do.  The
period during which other employees were allegedly given
this work lasted, however, only twelve days, from July 17 to
July 29, 2008.  Moreover, even then, the Postal managers
endeavored to accommodate Brown.  They responded with yet
another job offer.  This limited duty job offer -- which
excluded all duties that required Brown to work the window,
*i.e.*, the very duties that Brown repeatedly insisted
exceeded her restrictions -- was presented on September 17,
2008, and Brown rejected the offer.

27.   Brown does not dispute that these efforts at accommodating
her actually took place.  She merely denies or downplays
their significance, choosing instead to emphasize growing
frustrations exhibited by some unspecified managers:

28.   "No representative of Defendant ever even talked to me about
my condition and what it would take to allow me to work
within my restrictions.  Instead, Defendants constantly
yelled and/or spoke to me in a harsh tone of voice about how
they did not have enough work for me to do with all of my

to her declaration, amply expresses the frustration he
experienced in trying to find suitable work for Brown.  (Brown
Dec. ¶ 23 & Exh. E)

30

restrictions." (Brown Dec. ¶ 25)  Again, these and similar statements contained in Brown's declaration are objectionable on multiple grounds; they lack foundation (Fed.R.Evid. 602), are argumentative (Fed.R.Evid. 611(a)), assert an improper characterization (Fed.R.Evid. 103(c), 404-405), and express lay opinion (Fed.R.Evid. 701).

29. The record is replete, in any event, with examples of the numerous efforts the Postal managers made throughout the years to engage Brown and her doctors in a productive exchange of information.  (*See, e.g.*, Brown Depo. 151-52, 153-68, 172-76, 187-91, 199-200, 208-20, 223-26, 233-34, 238-42 & Exhs. 518, 522, 525, 527, 529, 532, 534, 535, 539, 542, 545, 546, 555, 558, 561, 567, 569, 571, 572, 575, 594, 595, 599, 604, 605, 607, 610, 618, 620, 621, 622, 623, 624, 626, 628, 632, 633, 634, 644, 648, 673, 683, 691, 692)

30. Brown dismisses these actions *in toto*, claiming that they did not help her but rather resulted in exacerbating her conditions.  (Brown Dec. ¶ 19)  However, the accommodations management offered were within her restrictions, and she does not claim otherwise.  Moreover, Brown fails to establish causation between the alleged denial of reasonable accommodations and the alleged deterioration of her impairments, since for much of her time at Bellflower, she took extended leaves of absence.  That Brown remained dissatisfied, despite the assistance she was provided, is irrelevant to the question of whether diligent, good-faith

efforts were made to reasonably accommodate her.   *See* <u>Kimbro</u>

<u>v. Atl. Richfield Co.</u>, 889 F.2d 869, 879 n.10 (9th Cir.

1989), *cert. denied*, 498 U.S. 814 (1990).

31.   Finally, there is no evidence that Brown received inferior

treatment to non-disabled employees because of her physical

restrictions.   To establish a *prima facie* case of disability

discrimination, Brown had to show that: (1) she is disabled;

(2) she is "otherwise qualified" for the position, with or

without a reasonable accommodation; and (3) she suffered an

adverse employment action because of her disability.   <u>Zukle</u>,

166 F.3d at 1045.   If she established her *prima facie* case,

the burden would then shift to the Postal Service to offer a

legitimate, non-discriminatory reason for the adverse

action.   If the Postal Service proffered such a reason, the

burden would shift back to Brown to show that the Postal

Service's reason is actually a pretext for discrimination.

<u>Lucero v. Hart</u>, 915 F.2d 1367, 1371 (9th Cir. 1990)

(citation omitted).

32.   Brown has presented no evidence satisfying the first two

elements of her *prima facie* case.   But even if she had, she

has presented no evidence that she received inferior

treatment to non-disabled employees *because of* her physical

restrictions.   Indeed, her disparate treatment claim appears

to rest almost entirely on the hearsay statements allegedly

made by Postmaster Puskas in the presence of two union

workers.   These statements do not constitute, as Brown

argues, direct evidence of discrimination -- not on the
record before the Court.  This is because there is no
evidence that any Postal manager, including Postmaster
Puskas, took any adverse action against Brown consistent
with those negative feelings.

33.  In fact, viewed in the light most favorable to Brown,
therefore, Postmaster Puskas's were not expressed through
his actions or anyone else's; the undisputed facts show that
the Postal managers tried diligently to work with Brown, in
spite of any resentments the Postmaster may have harbored.

34.  As for Brown's circumstantial evidence, she is missing a
*prima facie* case.  Not only has she failed to identify a
single similarly situated non-disabled employee who was
treated better than she under comparable circumstances, but
she has failed to identify any adverse actions taken against
her during the period of her active employment.

35.  Brown appears to have abandoned the argument that requiring
the voice recognition workers to work on Christmas and New
Year's Eve constituted discrimination.  To the extent that
she has not abandoned that claim, however, the EEO Affidavit
of Margaret Tippie amply sets forth Defendant's legitimate,
non-discrimination reason, which Brown has not proffered any
evidence disproving.

36.  Brown was not demoted or fired, which the Postal Service
could have done without violating the Rehab. Act; instead,
the terms or conditions of her position were modified per

her physician's instructions in order to accommodate her physical limitations. *Cf.* Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that transfer of job duties and undeserved performance ratings could constitutes adverse actions), *cert. denied*, 498 U.S. 939 (1990).

37. It is true that Brown is no longer on the active rolls. However, she was placed in her current inactive status, because, after four years of exploring options, the Postal Service could not find her another suitable permanent placement. (Solis Supp. Dec. ¶ 2, filed concurrently herewith.)

38. Brown claims that she need not present evidence of pretext on this issue because Defendant failed to address her inactive status in his moving papers. Brown's Second Amended Complaint does not, however, set forth a constructive discharge claim; nor can it liberally be construed as claiming that her present employment status constitutes an adverse action.

39. Brown's race/national origion and gender claims are equally unsustainable. A Title VII plaintiff may establish a prima facie case of disparate treatment based on race/national origin or gender by showing that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorably. Aragon v. Republic

1  <u>Silver State Disposal, Inc.</u>, 292 F.3d 654, 658 (9th Cir.

2  2002) (citation omitted).  If she is able to do so, the

3  burden of production shifts to the defendant to articulate a

4  legitimate, nondiscriminatory reason for its action.  <u>Id.</u>

5  The plaintiff must then demonstrate that the defendant's

6  articulated reason is mere pretext for unlawful

7  discrimination.  The plaintiff may do this by "'either

8  directly persuading the court that a discriminatory reason

9  more likely motivated the employer or indirectly by showing

10 that the employer's proffered explanation is unworthy of

11 credence.'"  <u>Id.</u> at 659, <u>quoting</u> <u>Chuang v. Univ. of Cal.</u>

12 <u>Davis</u>, 225 F.3d 1115, 1124 (9th Cir. 2000).

13 40.  Brown has presented no evidence that management treated

14      persons outside her race better than it treated Brown.  Nor

15      has she presented any evidence that her gender played a role

16      in any of management's actions towards her.

17 41.  To survive summary judgment on any of her harassment claims,

18      Brown had to show that: (1) she was subjected to verbal or

19      physical conduct because of her race, color, gender or

20      disability; (2) the conduct was unwelcome; and (3) the

21      conduct was sufficiently severe or pervasive to alter the

22      conditions of her employment and create an abusive work

23      environment.  <u>Kang v. U. Lim America, Inc.</u>, 296 F.3d 810,

24      817 (9th Cir. 2002) (national origin case); <u>Rene v. MGM</u>

25      <u>Grand Hotel, Inc.</u>, 305 F.3d 1061, 1066 (9th Cir. 2002),

26      *cert. denied*, 538 U.S. 922 (2003) (gender case).  Moreover,

27

28                                    35

1    an actionable hostile work environment "must both

2    subjectively and objectively be perceived as abusive."

3    <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923 (9th Cir.

4    2000) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. at

5    22-23, 114 S.Ct. 367 (1993)).

6    42.   Brown presented no evidence that she was abused by

7          management.  She demanded accommodations and was given those

8          that were reasonable.  She took multiple extended leaves of

9          absence, and she returned with demands so restricting that

10         it was clear that the time off had not been used

11         productively.  She presented no evidence that she was forced

12         to lift heavy packages.  She presented no evidence that she

13         was denied breaks when she needed them.

14   43.   The only admissible evidence presented to this Court shows

15         that she was given work that she said she could handle, but

16         there simply wasn't a sufficient amount of such light-duty

17         mail handling to occupy a full day.  When her conditions

18         deteriorated at Bellflower, she was transferred to Santa Ana

19         so that she wouldn't have to use her hands at all.  Later in

20         her employment, management was reluctant to give her work

21         she claimed she could do given her own doctor's onerous

22         restrictions.  Brown felt she was being forced out, but none

23         of her requested accommodations were rejected outright.

24   44.   Brown's retaliation claim must also be dismissed, as a

25         matter of law.  To state a <u>prima</u> <u>facie</u> case of retaliation,

26         the plaintiff must show (1) that she engaged in a protected

27

28                                    36

activity; (2) she thereafter received adverse treatment from her employer; and (3) that there was a causal connection between the protected activity and the adverse treatment. Wrighten v. Metro. Hospitals, Inc., 726 F.2d 1346, 1354 (9th Cir. 1984). Typically, causation may be inferred if two circumstantial factors exist: temporal proximity between the protected activity and the alleged retaliatory decision, and the employer's knowledge of plaintiff's participation in that activity. Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987), *cert. denied*, 498 U.S. 939 (1990).

45. Once the plaintiff states a prima facie case, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse action. If the employer is successful, the employee must then show that a retaliatory intent motivated the employer's action, which may be accomplished (1) indirectly by showing that the employer's proffered explanation was a pretext, or (2) directly by showing that a discriminatory reason more likely motivated the employer's action. Wrighten, 726 F.2d at 1354. "The ultimate burden of persuading the court that the defendant unlawfully retaliated against [him] remains at all times with the plaintiff." Cohen v. Fred Mayer, Inc., 686 F.2d 793, 796-97 (9th Cir. 1982).

46. Brown has presented no evidence that management took an adverse action against Brown, let alone one that was in any way causally related to her EEO activity. The undisputed

facts shows that management asked her what accommodations
she needed and endeavored to provide them.  Because she did
not get everything she demanded, Brown left work for months
at a time and then returned with additional demands, the
last of which were so onerous that even trying to meet them
would have been futile.  At some point, the onus shifted to
Brown to find a way, through her physical limitations, to
become once again a productive Postal worker.  She refused.

47.  In summary, the Court concludes that the Postal Service gave
Brown a multitude of reasonable accommodations throughout
her employment and treated her no differently from similarly
situated male employees, employees without disabilities, or
employees of different races and colors.

48.  The Court further concludes that, in light of the undisputed
evidence that the Postal managers fully respected their
legal obligations under the Rehab. Act, the isolated
statements attributed to the Bellflower Postmaster
purportedly indicating his initial displeasure with having
an injured worker on staff do not render Brown's otherwise
unsupported and unsupportable claims trial-worthy.
Accordingly, the Postal Service is entitled to summary
judgment, under <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Based on the Court's Conclusions of Law, the Court hereby

grants Defendant's motion for summary judgment in its entirety.

This action is hereby dismissed in its entirety with prejudice.

    The facts found herein have been reviewed and

    are supported by evidence (R).

IT IS SO ORDERED.


DATED: _December 8, 2009   _____
                     THE HONORABLE MANUEL L. REAL
                     UNITED STATES DISTRICT JUDGE


Presented by:

GEORGE S. CARDONA
Acting United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division


  /s/_____
IRA A. DAVES
Assistant United States Attorney
Attorneys for Defendant